Argued and submitted March 10, sentence of death vacated; case remanded to the
circuit court for further proceedings August 18, 1994

# STATE OF OREGON,
*Respondent,*

*v.*

# DALLAS RAY STEVENS,
*Appellant.*

## (CC 88-02-0368; SC S39427)

879 P2d 162

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for appellant. Diane L. Alessi, Chief Deputy Public Defender, with Sally L. Avera, Public Defender, filed the brief. Dallas Ray Stevens, appellant, filed a supplemental brief *pro se*.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause for respondent. With her on the briefs were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Brenda JP Rocklin and Kaye E. Sunderland, Assistant Attorneys General.

CARSON, C. J.

Fadeley, J., filed an opinion concurring in part and dissenting in part.

Van Hoomissen, J., filed a dissenting opinion.

## CARSON, C. J.

This is an automatic and direct review of a sentence of death based upon a conviction of aggravated murder. ORS 163.150(1)(g).[1] Defendant requests that this court vacate his death sentence. We vacate the sentence of death and remand to the circuit court for further proceedings.

In November 1988, a jury convicted defendant of three counts of aggravated murder following the February 1988 death of Nichole Edwards.[2] Defendant was sentenced to death.

On the first direct review, this court affirmed defendant's three convictions of aggravated murder, but vacated defendant's death sentence because "the trial court gave instructions that unconstitutionally limited the way in which the jury could consider mitigating evidence about him." *State v. Stevens*, 311 Or 119, 148, 806 P2d 92 (1991) (citing *State v. Wagner*, 309 Or 5, 14-20, 786 P2d 93, *cert den* 498 US 879, 111 S Ct 212, 112 L Ed 2d 171 (1990) [*Wagner II*][3]). In the penalty-phase proceeding on remand, a jury again sentenced defendant to death. That death sentence is reviewed here.

Defendant argues that the trial court in his second penalty-phase proceeding erred in excluding evidence that is relevant to the "fourth question" provided in ORS 163.150[4]

---

[1] ORS 163.150(1)(g) provides, in part: "The judgment of conviction and sentence of death shall be subject to automatic and direct review by the Supreme Court."

[2] The facts underlying the convictions are set forth in *State v. Stevens*, 311 Or 119, 121-23, 806 P2d 92 (1991).

[3] *State v. Wagner*, 309 Or 5, 786 P2d 93, *cert den* 498 US 879, 111 S Ct 212, 112 L Ed 2d 171 (1990) [*Wagner II*], was decided upon remand to this court by the Supreme Court of the United States after it vacated this court's decision in *State v. Wagner*, 305 Or 115, 752 P2d 1136 (1988), *vacated*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989) [*Wagner I*], in light of *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989).

[4] ORS 163.150(1) provides, in part:

"(b) Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in

and required by the Eighth Amendment to the Constitution of the United States.[5] Defendant argues that the trial court erred in sustaining the state's objection to a question that defendant's lawyer asked a state's witness on cross-examination. The witness, defendant's wife,[6] testified on direct examination that defendant had abused her and her daughter.[7] On cross-examination, defendant's lawyer asked the witness, "Do you have an opinion as to whether it would be better for [defendant's and witness's daughter] if her father lived in prison for the rest of his life without possibility of parole or died?" The state objected to the question as irrelevant and calling for speculation. The trial court excused the jury to hear argument by the parties on the state's objection. Defendant made three offers of proof to show why he believed that the information sought by the question was relevant.

The first offer of proof, taking place between defendant's lawyer and the witness, went as follows:

"Q: Now, do you have an opinion as to what your desire is for [your daughter] — [she] is nine to date; right?

"A: Yes.

"Q: What is your opinion about what is best for [your daughter]?

---

killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) *Whether the defendant should receive a death sentence.*

"\* \* \* \* \*

"(c)(B) *In determining the issue in paragraph (b)(D) of this subsection, the court shall instruct the jury to answer the question 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death.*" (Emphasis added.)

[5] The Eighth Amendment to the Constitution of the United States provides: "Excessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted.*" (Emphasis added.)

[6] Defendant and the witness had been separated since 1987, but were still married at the time of the penalty-phase proceeding.

[7] Defendant also testified at the penalty-phase proceeding that he had touched his daughter sexually the year before the murder of Nichole Edwards.

"A: I think to know that her dad was executed by the State would be destructive to her.

"Q: In what way?

"A: Well, emotional. I'm sure she would feel responsible somehow. It would not be good for her. I mean, she knows he's going to be in there the rest of his life, and that's, you know, that's a better story than they killed him.

"* * * * *

"Q: If — do you have any thoughts, with looking at other death sentences that have been carried out, about what you feel [your daughter's] age would likely be at the time her father was actually executed?

"A: She'll be very aware. She'll understand everything. I mean, she'll be a teenager then. You can't hide it. You can't, you know, sugar coat it. You can't make it anything but what it will be.

"* * * * *

"Q: Can you say anything else about what you feel that the effect of executing her father would have on [your daughter]?

"A: How can you put into words what —

"Q: I realize how difficult it is.

"A: I know. I know, 'cause she's just a child now. She's got — I'm not so sure that she's aware of how, I don't know, how — I don't know what the word is I'm — what type of crime that was committed already, you know. And how just, I don't know, deep it is, I guess. I don't know. It was easy for her probably to block some out and ignore, you know, the sharp edges of it. But when it's brought all back to her, you know, it's just — and then she'll realize even more that, you know, just something that was so bad that, you know, they took his life for it, too. And, you know, that's pretty — that's pretty serious punishment.

"You know, it's just not going to be good for her at all. I mean, she knows that he's going to be in prison the rest of his life. She'll never hug him. She knows he's going to grow old and gray and die. But she doesn't know they're going to kill him."

Defendant also read into the record a transcript from the first penalty-phase proceeding in which defendant's lawyer asked the witness whether she would allow her daughter to visit defendant in jail. The witness responded:

"M-m-m, in time when [my daughter] can fully accept and everything for what everything is worth and its face value is, if she really would want to see her dad, I would do what she wanted to do for herself, you know. If she wanted to go look at him just to see him, to maybe to get a feeling if she hated him, or what she really felt. Whatever she wanted I'll go do with her, because she's got to sort out her feelings, too. She's got the right. She's the person."

In the present proceeding, the witness testified that she would answer the question the same way that she did at the first proceeding.

Defendant's final offer of proof, taking place between defendant's lawyer and the witness, went as follows:

"Q: Is there something about Dallas Ray Stevens and the Dallas Ray Stevens that you've known over the years when you were married to him and lived with him, that you feel that his character is such that your daughter should be able to talk to him about such things?

"A: I really don't understand what you're saying. I —

"Q: Okay. Go ahead. You were going to ask —

"A: I just — I don't understand your question actually.

"Q: All right. What I'm saying, is there something about Dallas Ray Stevens, his character and how he associated with and worked with his daughter that you feel that she should be given an opportunity to see if she wants to rekindle that condition, because of what he was in the past?

"A: I believe that when she's able to understand everything about the whole situation, you know, the darkest and the lightest parts of it, if she can — you know, she's got to understand the whole picture as it is — to be — you know, and then it — from there, it's her choice, you know. But if she's old enough to understand clearly and, you know, not have any false pictures or cover ups or, you know, in her mind.

"Q: So sometime when she can understand the pros and the con, namely the love that she had for her father in the early years and the hatred that she might have for him because he killed her cousin; is that what you're saying?

"A: Yes. You know, 'cause I feel that she's probably got some blocks on it now that block out the ugliest points and what not. But when these come to light to where she understands everything. I don't know, she's old enough to handle it

and understand it, I'm sure she's still going to, you know, want to see him for maybe some reason or another.

"Q: And that's because of his early years with [her]?

"A: He is her father."

The trial court sustained the state's objection to defendant's question on the ground that the evidence sought by the question was irrelevant. The court stated: "I don't find that the mother's belief about what's in the best interest of the child would relate in any way to the defendant's background or character."

Defendant argues that the trial court erred, both as a matter of statutory law and as a matter of constitutional law, in refusing to admit evidence of how defendant's "daughter may feel about him and what might be best for her in terms of his punishment." Defendant argues that evidence of the potential effect of his execution on his daughter is relevant to the "fourth question" provided in ORS 163.150 and required by the Eighth Amendment to the Constitution of the United States.

Before reaching defendant's constitutional claim, we first consider defendant's statutory argument. *See State v. Rodriguez*, 317 Or 27, 31, 854 P2d 399 (1993) (applying that methodology). ORS 163.150(1)(a) provides that, in a capital penalty-phase proceeding, "evidence may be presented as to any matter that the court deems relevant to sentence." Defendant argues that the trial court erred in excluding his wife's testimony about the possible effect of his execution upon his daughter because that evidence was relevant to the statutory fourth question: "Whether the defendant should receive a death sentence." ORS 163.150(1)(b)(D). The statute further provides:

"In determining the issue in [the fourth question], the court shall instruct the jury to answer the question 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death." ORS 163.150(1)(c)(B).

The state argues that, because the potentially harmful effect of defendant's execution on his daughter does not reflect upon defendant's character or background or upon

any circumstances of the offense, the evidence is not relevant to the fourth question, and the trial court was correct in excluding it.

The standard of relevance set forth in OEC 401 applies in penalty-phase proceedings. *See, e.g., State v. Moen*, 309 Or 45, 73, 786 P2d 111 (1990) (using standard of relevance set forth in OEC 401 to determine whether prior criminal conduct was relevant in penalty-phase proceeding). Under OEC 401, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

In order for us to determine what type of evidence is relevant to the fourth question, we first must ascertain the legislature's intent in enacting ORS 163.150. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) (setting forth method of statutory interpretation). To determine legislative intent, we first examine the text and context of the statute. 317 Or at 610-11.

The text of ORS 163.150(1)(b) is written in very general terms. The jury is asked to decide "whether the defendant should receive a death sentence." The statute provides that the jury should consider "any aspect of the defendant's character or background, or any circumstances of the offense" in making that determination. The text is silent as to the meaning of any of those terms. Moreover, the context is not instructive as to what the legislature intended by the terms "any aspect of the defendant's character or background" or "any circumstances of the offense." Because the intent of the legislature is not clear from the text and context of the statute, we turn to legislative history. *See PGE v. Bureau of Labor and Industries, supra*, 317 Or at 611-12 (if text and context of a statute do not make clear the intent of the legislature, this court considers legislative history of the statute).

Originally, Oregon's death penalty statute had only three questions for the jury to answer in making a sentencing determination. ORS 163.150(1)(b)(A)-(C) (1987 replacement part). On June 26, 1989, while the 1989 legislature was still in session, the Supreme Court of the United States issued its

decision in *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989). In *Penry*, the Court held that the Texas three-question statutory sentencing scheme, from which the Oregon scheme had been taken, did not allow the jury to consider fully the effect of mitigating evidence offered by the defendant. 492 US at 328.

The Supreme Court held:

> "Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a ' "reasoned *moral* response to the defendant's background, character, and crime" ' * * * [T]he jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." *Id.* (Citations omitted.) (Emphasis in original.)

In an attempt to ensure that Oregon's death penalty statute was brought into compliance with *Penry* by the end of the legislative session, the 1989 legislature added a fourth question to the death penalty statute. On July 1, 1989, the Oregon Department of Justice submitted an amendment to the Senate Judiciary Committee that was "designed to codify the additional procedure constitutionally required in certain death penalty cases." After a work session in the Senate Judiciary Committee and a conference committee work session, the bill passed with the amendment submitted by the Department of Justice.

As enacted in 1989, the statutory "fourth question" read: "If constitutionally required, considering the extent to which the defendant's character and background, and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed." ORS 163.150(1)(b)(D) (1989). The addition of the fourth question was clearly an attempt by the 1989 legislature to meet the requirements of the Eighth Amendment as those requirements were interpreted in *Penry v. Lynaugh, supra.*

One year later, in *Wagner II*, this court held that the fourth question codified in 1989 did not satisfy the directives of the Eighth Amendment as explained in *Penry*. 309 Or at 18-19. This court held: "The lack of grammatical clarity in

the statutory statement of the issue must translate into an intelligible instruction to a jury for the sentencing process to be effective." *Id*. at 18. The court went on to suggest a question that would comply with the Eighth Amendment:

> "Accordingly, consistent with ORS 163.150(1)(b)(D) (1989) and the guidelines of *Penry*, if constitutionally required in a particular case, the trial court must instruct each juror on the fourth issue, which instruction may (but need not) be the following:
>
>> " 'Should defendant receive a death sentence? You should answer this question "no" if you find that there is any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death.' " *Id*. at 18-19.

In 1991, the legislature modified the statutory fourth question to comply with this court's holding in *Wagner II*. Once again, a representative from the Department of Justice testified in favor of the bill. She summarized the purpose of the bill before the Senate Judiciary Committee:

> "[T]he Oregon Supreme Court also said in January 1990 [in *Wagner II*], the language of the amendment enacted in 1989 was not adequate as a jury instruction, and in fact, should not be used as a jury instruction. And, in that same opinion, the court suggested some alternative language that could be used as a jury instruction in instructing the jury on the fourth question. * * * What House Bill 2392 does is refine the fourth question in the death penalty statute to conform to the language suggested by the Oregon Supreme Court." Tape recording, Senate Judiciary Committee, May 24, 1991, tape 18 B.

The bill was incorporated into another one and was enacted without change to the amendments proposed by the Department of Justice. Moreover, ORS 163.150(1)(b)(D) and (c)(B) adopt precisely the language set forth in *Wagner II*.

The passage of the original fourth question after *Penry* and the modification of that question following *Wagner II* make it clear that the legislature intended the scope of the statutory fourth question to be co-extensive with the scope of the fourth question held in *Penry* and *Wagner II* to satisfy the requirements of the Eighth Amendment to the Constitution of the United States. Accordingly, cases dealing with the Eighth Amendment fourth question and with the evidence

relevant to that question inform our inquiry as to the scope of evidence that is relevant under the statute.

In *Lockett v. Ohio*, 438 US 586, 604, 98 S Ct 2954, 57 L Ed 2d 973 (1978), a plurality of the Supreme Court of the United States stated:

> "[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Footnote omitted.) (Emphasis in original.)

As stated above, in *Penry v. Lynaugh, supra*, the Supreme Court essentially adopted the plurality opinion in *Lockett* and held that the "jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." 492 US at 328.

We must determine whether the testimony sought by defendant from his wife would be relevant to any aspect of defendant's character or background or to any circumstances of the offense. The terms "character" and "background" as they were used in *Penry*, and, therefore, as they are used in ORS 163.150, have been read quite broadly and have not necessarily been linked to a defendant's culpability for the crime for which he or she is being sentenced. In *Skipper v. South Carolina*, 476 US 1, 5, 106 S Ct 1669, 90 L Ed 2d 1 (1986), the Supreme Court held that testimony about the defendant's behavior in prison after the murder and about the defendant's adaptability to prison life was both relevant and mitigating for the purposes of the Eighth Amendment. The Court held that "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." 476 US at 7.

Defendant argues that his wife's testimony is relevant because testimony about the anticipated negative effect of his execution on his daughter suggests something particular about his character and background.[8] We agree that

---

[8] Defendant does not argue, and there is no suggestion, that the witness's testimony is relevant to "any circumstances of the offense." ORS 163.150(1)(c)(B).

testimony by the relatives of a capital defendant may be informative about certain aspects of the defendant's character. *Cf. Payne v. Tennessee*, 501 US 808, 111 S Ct 2597, 115 L Ed 2d 720 (1991) (recognizing that testimony by loved ones about impact of loss of murder victim says something about the character of the victim).

In order to determine whether the testimony proffered by the witness in this case is relevant to defendant's character or background, we must examine defendant's offers of proof. Clearly, not everything to which the witness testified in the offers of proof is relevant. Nonetheless, the standard contained in OEC 401 "is a very low threshold that evidence must cross to be considered relevant." *Dept. of Trans. v. Lundberg*, 312 Or 568, 575, 825 P2d 641, *cert den* ___ US ___, 113 S Ct 467, 121 L Ed 2d 374 (1992). During the offers of proof, the witness testified: "I think [that for defendant's daughter] to know that her dad was executed by the State would be destructive to her." The witness also stated:

> "[I]t's just not going to be good for her at all. I mean, she knows that he's going to be in prison the rest of his life. She'll never hug him. She knows he's going to grow old and gray and die. But she doesn't know they're going to kill him."

The witness also testified: "I'm sure she's still going to, you know, want to see him for maybe some reason or another."

While the witness's testimony may not offer any direct evidence about defendant's character or background, it does offer circumstantial evidence. A rational juror could infer from the witness's testimony that she believed that her daughter would be affected adversely by defendant's execution because of something positive about his relationship with his daughter and because of something positive about defendant's character or background. Put differently, a rational juror could infer that there are positive aspects about defendant's relationship with his daughter that demonstrate that defendant has the capacity to be of emotional value to others. In that inference, a juror could find an aspect of defendant's character or background that could justify a sentence of less than death.

Because the witness's testimony permits an inference that the defendant's execution would affect his daughter negatively because of some mitigating aspect of defendant's character or background, it is relevant to the fourth question. The trial court erred in sustaining the state's objection to the testimony.

■ The state also argues that, even if it were error for the trial court to exclude the witness's testimony, the error was harmless. We disagree. The statutory fourth question asks jurors to decide whether, considering all the evidence, there is anything in the defendant's character or background or in the circumstances of the offense that prevents them from believing that the death penalty is appropriate in the particular case. Here, the trial court erred in excluding evidence from which jurors could infer positive aspects of defendant's character or background. Error is harmless only if "there is little likelihood that the error affected the verdict." *See State v. Barkley*, 315 Or 420, 428, 846 P2d 390, *cert den* ___ US ___, 114 S Ct 116, 126 L Ed 2d 81 (1993) (applying that standard).

As this court summarized in *Wagner II*, the fourth question is a "mechanism for the sentencing jury to give meaningful effect to its consideration of the entire range of possible mitigating evidence and to provide a 'reasoned moral response' to the ultimate question of whether the defendant should live or die." 309 Or at 13. Because of the nature of the fourth question, it is the rare case in which this court can determine, when evidence relevant to that question is excluded, that the evidence could not have affected the jury's "reasoned moral response" in determining whether defendant should have received a death sentence. This is not that rare case. We hold that the trial court's error was not harmless.

Because we resolve the issue on statutory grounds, we do not reach defendant's constitutional argument. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (if state law provides the protection that a defendant seeks, this court will not reach a federal constitutional issue).

Because we vacate defendant's death sentence based upon his fourth assignment of error and because the other

assignments of error will not necessarily recur on remand, we do not reach defendant's other assignments of error.

The sentence of death is vacated. The case is remanded to the circuit court for further proceedings.

**FADELEY, J.,** concurring in part and dissenting in part.

I agree that reversible error occurred by the exclusion of evidence in mitigation. With that holding I therefore concur. However, I cannot agree in this 1988 case that placing the "fourth" or "death question" before the jury was a lawfully authorized act in the past, or that it will be in the future. No statute effective in 1988 ever authorized it. And, absent such an authorization, we cannot uphold a death penalty arrived at by a penalty procedure that was and is not authorized by a lawfully adopted statute.

The homicide in this case occurred in 1988 at a time when we know that the Oregon statute, adopted in 1984 to authorize and regulate imposition of the death penalty by a jury, violated federal constitutional standards. The Supreme Court of the United States vacated a death sentence imposed under that statute and remanded the case to this court in *Wagner v. Oregon,* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). Thereafter, this court, by a majority vote, added 100 words and a completely new question to the statute in an effort to save it from the constitutional infirmity disclosed by *Wagner v. Oregon, supra. See State v. Moen,* 309 Or 45, 102-04, 786 P2d 111 (1990) (Fadeley, J., dissenting, detailing that judicial legislation); *State v. Williams,* 313 Or 19, 44-45, 828 P2d 1006, *cert den,* ___ US ___, 113 S Ct 171, 121 L Ed 2d 118 (1992) (same). A legally deficient or questionable decision such as that does not form the basis for any *stare decisis* or have precedential effect.

Our precedents against judicial legislation prohibit *that* kind of judicial legislation the same as any other kind. In *State v. Smith,* 56 Or 21, 29, 107 P 980 (1910), this court opined that "[i]t is not the function of courts to make laws, but to interpret them." More recently, this court held, again, that only the legislative branch may enact penal laws. *State v. Isom,* 313 Or 391, 395, 837 P2d 491 (1992) ("the power of punishment is legislative"). This court has never had any

inherent power to authorize the death penalty without the consent of the legislative branch.

Accordingly, the previous remand could not properly have resulted in a "fourth" question or a death penalty. Because both, nonetheless, occurred, the resulting judgment should be vacated — but not, in my view, just because of the erroneous exclusion of background mitigation evidence. Life imprisonment, as it was available in 1988, should be imposed without further ado. I dissent from any implication that any other act is permissible on remand.

### VAN HOOMISSEN, J., dissenting.

The question in this death-penalty proceeding is: What kind of evidence is relevant to defendant's "character or background" in determining whether defendant should receive a death sentence? ORS 163.150(1)(b) and (c). Defendant contends that the trial court erred in sustaining the state's objection to his question to witness Christine Stevens, his estranged wife, about their daughter Emily's welfare if defendant were to be sentenced to death.

The trial court sustained the state's objection on the ground that the evidence sought by the question was irrelevant, stating: "I don't find that the mother's belief about what's in the best interest of the child would relate in any way to the defendant's background or character."[1]

Defendant argues that the admission of evidence of the supposed potential effect of his execution on his daughter is required by ORS 163.150(1)(c)(B). He posits:

> "An aspect of defendant's background is the fact that he has a daughter and also that he was convicted of molesting her. How this daughter may feel about him and what might be best for her in terms of his punishment are matters which the jury should be able to consider in deciding the appropriate sentence."

The state argues that evidence of the supposed potential effect of defendant's execution on his daughter does not reflect on *his* "character or background" and, therefore, the

---

[1] Defendant did not argue that the testimony was relevant to "any circumstances of the offense." ORS 163.150(1)(c)(B).

witness' testimony is not relevant to the question whether he should receive a death sentence.

ORS 163.150(1)(c)(B) provides that the trial court shall instruct the jury

"to answer the question [whether the defendant should receive a death sentence] 'no' if one or more of the jurors find there is any aspect of the defendant's character or background, or any circumstances of the offense, that one or more of the jurors believe would justify a sentence less than death."

As the trial court correctly noted, that statute focuses on *defendant's* character or background, not on the character or background of someone else.

I would hold that the witness' testimony was not relevant to the fourth question and, therefore, that the trial court did not commit statutory error in sustaining the state's objection to the testimony. Accordingly, I respectfully dissent.

Whether evidence is relevant to an issue in dispute is a question of law. *State v. Pinnell*, 311 Or 98, 109 n 17, 806 P2d 110 (1991).[2] To determine what type of evidence is relevant to the fourth question, I look for the legislature's intent in enacting ORS 163.150(1)(c). *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993) (setting forth method of statutory interpretation). To determine legislative intent, I first look to the text and context of the statute. *Id.* at 610-11.

---

[2] The state suggests that the Oregon Evidence Code (OEC) does not apply to the penalty phase of a capital proceeding and that the standard for relevance should derive from some other source. In *State v. Montez*, 309 Or 564, 605 n 13, 789 P2d 1352 (1990), this court recognized that the OEC generally does not apply in sentencing proceedings, citing OEC 101(4)(d). However, because the state agreed in *Montez* to be bound by the OEC, this court expressed no opinion in that case as to the OEC's applicability generally to capital sentencing proceedings. Although not specifically stated in the present case, it appears from the conduct of the parties and the trial court that the same understanding occurred here. Moreover, this court has applied the OEC to penalty phase issues in other recent capital cases. *See, e.g., State v. Langley*, 314 Or 247, 262-66, 839 P2d 692 (1992), *adhered to on recons* 318 Or 28, 861 P2d 1012 (1993) (admissibility of exhibit); *State v. Williams*, 313 Or 19, 43, 828 P2d 1006, *cert den* \_\_\_\_ US \_\_\_\_, 113 S Ct 171, 121 L Ed 2d 118 (1992) (weighing probative value of evidence against prejudice). On further reflection, I now would hold that the OEC applies to capital penalty phase proceedings and, to that extent, concur in the majority opinion.

In ORS 163.150(1)(b)(D) the jury is asked to decide "Whether the defendant should receive a death sentence." ORS 163.150(1)(c)(B) requires the jury to consider any aspect of the defendant's "character or background" in making that determination. The text is ambiguous as to the meaning of the terms "character" and "background." Although the terms may have "plain meanings," their "plain meanings" as described in the dictionary are so broad as to be unhelpful in this case.[3] Moreover, the context of the statute is not instructive as to what the legislature intended by the terms "character" and "background." Because the intent of the legislature is not clear from the text and context of the statute, I next turn to legislative history. 317 Or at 611-12.

Prior to 1989, Oregon had only three questions for the jury to answer. ORS 163.150(1)(b)(A)-(C) (1984). In *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989), the Supreme Court of the United Stated held that Texas' three-question statutory sentencing scheme, from which the Oregon scheme was derived, did not allow the jury to fully consider the effect of the defendant's mitigating evidence. The Supreme Court explained:

"Rather than creating the risk of an unguided emotional response, full consideration of evidence that mitigates against the death penalty is essential if the jury is to give a 'reasoned *moral* response to the defendant's background, character, and crime * * *.' [T]he jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." 492 US at 301. (Citations omitted; emphasis in original.)

In an attempt to comply with *Penry*, the 1989 legislature added a fourth question to Oregon's death penalty statute:

"If constitutionally required, considering the extent to which the defendant's character and background, and the circumstances of the offense may reduce the defendant's moral culpability or blameworthiness for the crime, whether a sentence of death be imposed." ORS 163.150(1)(b)(D) (1989).

---

[3] That is particularly true as regards the word "background."

In *State v. Wagner*, 309 Or 5, 18-19, 786 P2d 93, *cert den* 498 US 879 (1990) (*Wagner II*), this court concluded that the fourth question added in 1989 did not comply with the Eighth Amendment as interpreted in *Penry*:

> "The lack of grammatical clarity in the statutory statement of the issue must translate into an intelligible instruction to a jury for the sentencing process to be effective." *Id.* at 18.

In *Wagner II*, this court suggested a question that would comply with the Eighth Amendment:

> "Should defendant receive a death sentence? You should answer this question 'no' if you find that there is any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death." *Id.* at 18-19.

The 1991 legislature modified the statutory fourth question to comply with this court's holding in *Wagner II*. ORS 163.150(1)(b)(D) and (c)(B) track that language in *Wagner II*.

The original enactment of the fourth question after *Penry*, and the modification following *Wagner II*, make it clear that the legislature intended the scope of the statutory fourth question to be co-extensive with the scope of the fourth question required by the Eighth Amendment. Accordingly, cases dealing with the Eighth Amendment fourth question and with what kind of evidence is relevant to that question inform our inquiry under ORS 163.150(1)(c)(B).

In *Lockett v. Ohio*, 438 US 586, 604, 98 S Ct 2954, 57 L Ed 2d 973 (1978), a plurality of the Supreme Court of the United States concluded:

> "[T]he Eighth and Fourteenth Amendments require that the sentencer in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (Footnote omitted; emphasis in original.)

In *Penry v. Lynaugh, supra*, the Supreme Court, in essence, adopted the plurality opinion in *Lockett* and held that the "jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime." 492 US at 302.

The terms "character" and "background," as used in *Lockett* and *Penry* and, therefore, as used in ORS 163.150-(1)(c), have been read quite broadly and have not necessarily been linked to a defendant's culpability for the specific crime for which he or she is being sentenced. For example, in *Skipper v. South Carolina*, 476 US 1, 5, 106 S Ct 1669, 90 L Ed 2d 1 (1986), the Supreme Court held that testimony about the defendant's behavior in prison after the murder and about the defendant's adaptability to prison life was relevant for Eighth Amendment purposes. The Court explained that "a defendant's disposition to make a well-behaved and peaceful adjustment to prison life is itself an aspect of his character that is by nature relevant to the sentencing determination." *Id.* at 7.

In order to determine whether the witness' testimony in this case was relevant to defendant's "character or background," we must carefully examine defendant's offers of proof.

In an offer of proof, the witness testified that a sentence of death would not be good for her daughter, explaining:

"A: How can you put into words what —

"* * * * *

"A: I know. I know, 'cause she's just a child now. She's got — I'm not so sure that she's aware of how, I don't know, how — I don't know what the word is I'm — what type of crime that was committed already, you know. And how just, I don't know, deep it is, I guess. I don't know. It was easy for her probably to block out and ignore, you know, the sharp edges of it. But when it's brought all back to her, you know, it's just — and then she'll realize even more that, you know, just something that was so bad that, you know, they took his life for it, too. And, you know that's pretty — that's pretty serious punishment."

The witness said that she would allow her daughter to see defendant "[i]f [daughter] wanted to go look at him just to see him, to maybe get a feeling if she hated him, or what she really felt." When defense counsel asked the witness whether there was anything about defendant's "character" that suggested "that your daughter should be able to talk to [defendant] about such things?," the witness responded, "I don't know,

when she's old enough to handle it and understand it, I'm sure she's still going to, you know, want to see him for maybe some reason or another." The witness added only, "He is her father."

An examination of defendant's offers of proof demonstrates that the witness did not know how her daughter actually felt about defendant and that she did not purport to know what her daughter thought defendant's sentence should be. Defendant's offers of proof do not suggest that the witness had even discussed those matters with her daughter.

Given that the daughter had been sodomized by defendant when she was only five years old and that he had sexually abused and then brutally murdered her five-year-old cousin and also had kidnapped, sexually abused, and assaulted her four- and eight-year-old cousins, what, in fact, would have been good for the witness' daughter, if relevant at all, would be a matter requiring expert testimony. OEC 702. *See State v. Tucker*, 315 Or 321, 340 n 4, 845 P2d 904 (1993) (Unis, J., concurring) ("If expertise is required to supply the rational link between the opinion or inference and the perceived facts, the opinion or inference will not be admissible unless the requirements for expert testimony under OEC 702 have been met.").

Taken together, defendant's three offers of proof suggest only that the witness thought that her daughter might be adversely affected by defendant's execution, because her daughter might be forced to face the gravity of his offenses, or because somehow it would deprive her daughter of the ability to work through her problems created by defendant's aggravated murder of her cousin and his sexual abuse of her and her three young cousins. Notwithstanding defendant's argument that he did not deserve the death penalty because he eventually could be of benefit to his daughter, nothing in defendant's three offers of proof suggests that, because of something particular to defendant's "character or background," a rational inference could be drawn that there are positive aspects about defendant's relationship with his daughter that demonstrate his "capacity to be of emotional value" to her. 319 Or at 584.

The testimony proffered by defendant here did not permit an inference that, because of something particular about defendant's "character or background," defendant's execution would have a negative impact on a family member. The witness' testimony did not speak to defendant's execution as a unique loss to his daughter. Rather, it went to what the witness thought might be in the best interest of the *daughter* (irrespective of her relationship with defendant); it did not implicate or illuminate *defendant's* "character or background." Despite three offers of proof, the witness was never able to relate her opinion to *defendant* in any way. Shorn of the witness' understandable concern for her daughter's welfare, the proffered testimony amounted to little more than the witness' own preference as to the defendant's sentence. The testimony, therefore, was not relevant to the fourth question and the trial court did not commit statutory error in excluding it.

Although this court has not previously considered whether the opinions of a defendant's family members as to the sentence that he or she should receive are relevant under ORS 163.150(1)(c), other courts have held that such opinions are *not* relevant. *See, e.g., State v. Moore*, 122 NJ 420, 585 A2d 864, 894 (1991) (capital case: testimony nonspecific to the defendant's character properly excluded by trial court); *State v. Rose*, 120 NJ 61, 576 A2d 235, 236 (1990) (capital case: emphasizing the need for mitigating evidence to be specific to the defendant); *Sattiewhite v. State*, 786 SW2d 271, 290 (Tex App 1989), *cert den* 498 US 881 (1990) (capital case: testimony as to whether death or life imprisonment should be assessed was properly excluded); *see also Wunneburger v. State*, 844 SW2d 864, 869 (Tex App 1992), *rev den* (1993) (aggravated robbery: opinions that would amount to a recommendation of a particular punishment to the trier of fact rejected).

In sum, the trial court correctly held that the witness' testimony, which in fact was nothing more than the witness' opinion as to the sentence for defendant that she thought might be best for their daughter, was not relevant to defendant's "character or background." The trial court, therefore, did not err in sustaining the state's objection to the testimony.

It has been said that "hard cases make bad law." This case illustrates that principle.

I respectfully dissent.[4]

---

[4] Because the majority does not reach defendant's constitutional arguments on his fourth assignment of error, I will not do so.